

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ALBERTO PENA, | § | |
| | | No. 08-16-00236-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 120th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20120D04958) |
| | § | |

**OPINION ON MOTION FOR REHEARING**

After submission of our original opinion, Appellant, Alberto Pena, filed a motion for rehearing urging us to reconsider our rulings with respect to the first, second, and third issues raised in his original brief relating to the trial court's limitations on his voir dire. Although we deny Appellant's motion for rehearing, we withdraw our original opinion and judgment of October 26, 2018, and substitute the following opinion and judgment in their place.

A jury convicted Alberto Pena of one count of aggravated sexual assault of a child and one count of indecency with a child and sentenced him to twenty years' imprisonment for each conviction. He now appeals his convictions in nineteen issues. We affirm.

**BACKGROUND[1]**

---

[1] Due to the number of issues raised on appeal, and in the interest of brevity, we discuss the basic underlying facts of

On September 26, 2012, David Solis, the principal of an elementary school in El Paso, Texas, received information from a bus monitor that J.M.,[2] a nine-year old student in the fourth grade who was new to the school, had mentioned that she had problems at home, mainly that her father (Pena) was mean to her. Solis described that the report came on a day when children would be released early. Late in the morning, about 11:15 a.m., Solis brought J.M. into his office to ask her about her conversation with the bus monitor. Solis described J.M. as being active and emotional. He asked her to share what she had shared with the bus monitor. J.M. told Solis that her father was mean to her, he would hit her with a belt, and she described an incident where he forced her to hold two bottles with her arms extended, and if she dropped them, he would hit her, and it would hurt a lot.

J.M. became teary eyed after she spoke. Solis paused for a moment, allowed her to finish, then asked her if there was anything else. J.M. said there were times she would get beaten with a belt, that she would hide under her bed, and her younger sibling would hide, too, and they both would get punished after they were located. J.M. also stated that her grandparents would hit her as well. When Solis asked her if there was anything else she wanted to say, J.M. became more emotional, began to shake and stayed quiet. Solis decided she may be more comfortable speaking to his assistant principal, Rosa Perez, so he went to find her. Unable to locate Perez before the bell rang, Principal Solis made sure that J.M. made it to her bus on time. Later, after Solis informed Perez of his conversation, Perez filed a CPS report that evening.

---

the case here. Other facts more pertinent to each issue will be discussed in the respective section of each issue.

[2] To protect the identity of the minor-victim and her minor sibling, we refer to them by their initials. *See* TEX. R. APP. P. 9.10(a)(3).

2

The following day, Solis provided Perez with background information of his conversation with J.M. Perez then called J.M. to the school counselor's office so that she could talk to her. During the ensuing conversation, in which J.M. seemed tense and nervous, J.M. told Perez and the school counselor who was present that she did not like Pena because he would hit her with his hand or shoe, force her to kneel and hold up bottles, and make her "do things." As J.M. was saying this, Perez noticed that she was squirming in her chair. When asked whether she knew the difference between "good touch" and "bad touch," J.M. said that she did. When Perez asked if Pena had hurt her before, J.M. said, "just with the touches." At this point, Perez instructed the school counselor to call CPS. As J.M. gave details about what Pena had done, Perez noted that she seemed relieved to be talking about it. J.M. also said that she was worried about the well-being of her brother, J.P. Neither J.M. nor J.P. were allowed to go home that day, and law enforcement took both children to the Child Advocacy Center (CAC) in El Paso, Texas.

J.M. was subsequently interviewed at the CAC for suspected abuse. She was also examined by Gloria Salazar, a Sexual Assault Nurse Examiner (SANE), who later testified at trial that she found bruises throughout J.M.'s body. Nurse Salazar wrote in her SANE report that J.M. reported pain coming from her neck, vagina, and anus. During the examination, J.M. told Nurse Salazar that Pena had attempted to put his "thing" inside her, and she had tried to prevent him from doing so, but her father did not let her. She also indicated to Nurse Salazar that Pena had penetrated her vagina and anus with his fingers, and that she did not tell him to stop because Pena was intoxicated at the time, and because he would have become angry if she had done so. J.M. also told Salazar that Pena beat her with his shoes, and he hit her almost every day after school. Following the SANE examination, J.M. was subsequently placed into several foster homes and

3

treatment centers.

The State charged Pena by indictment with three counts of aggravated sexual assault of a child, and two counts of indecency with a child. At trial, the State called J.M. to testify. At the time of trial, J.M. was twelve years old and entering the seventh grade. When she was asked about the period of 2012, J.M. testified she was then living with her grandparents, her father, her uncles, and her brother, and attended Desert Wind school. J.M. described she would sleep on a bed that pops out of the couch in the living room. Her father slept on the bed with her and her brother slept on the other couch next to the bed except that she and her brother sometimes took turns and switched with each other.

When asked about the day she talked to the bus driver, J.M. testified Pena sexually assaulted her by penetrating her vagina with his penis and fingers. She also testified that Pena touched her the same with his hands and on the outside of her private part. She further testified that Pena had previously sexually assaulted her while he was in the shower with her, that his sexual abuse toward her started when she was approximately four or five years old, and that Pena had on one occasion forced her to hold his penis in her hands and make them "go up and down."

To rebut these accusations, the defense presented the theory that J.M. had made a false outcry of sexual abuse against Pena. In support of this contention, it argued, *inter alia*, that J.M. was dishonest and manipulative, had been diagnosed with conduct disorder and exhibited other psychological issues, and had made allegedly false outcries against various other people to get what she wanted, citing testimony from J.M. and the defense's own witnesses for these propositions. Pena also testified in his defense, denying that he committed the offenses against J.M., but admitting that he slept in the same fold-out couch with her and that he would spank her.

4

Prior to submitting the case to the jury, the State abandoned one count of indecency with a child. The jury acquitted Pena of two counts of aggravated sexual assault, convicted him of one count of aggravated sexual assault and one count of indecency with a child, and sentenced him to twenty years' imprisonment for each conviction. This appeal follows.

## DISCUSSION

Pena raises nineteen issues on appeal. In the interest of efficiency, we will address issues raising similar arguments together and discuss them out of numbered order. As a rendition issue, we first consider Pena's challenges to the legal sufficiency of the evidence. These issues will be followed by his challenges to the trial court's evidentiary decisions. Lastly, we will address issues regarding procedural matters.

## SUFFICIENCY OF THE EVIDENCE

We first address Pena's challenges to the sufficiency of the evidence supporting his convictions. *See, e.g., Garcia v. State*, No. 11-08-00159-CR, 2010 WL 1713026, at *1 (Tex. App.—Eastland Apr. 29, 2010, pet. ref'd) (mem. op., not designated for publication). In Issues Seven and Eight, Pena argues that the evidence was legally insufficient to support his convictions for aggravated sexual assault of a child and indecency with a child by sexual contact. Pena argues in Issue Seven that the evidence was legally insufficient to prove that Pena digitally penetrated J.M.'s sexual organ. In Issue Eight, Pena argues the evidence was legally insufficient to prove that he intended to cause J.M. to touch his genitals with the intent to arouse or gratify his sexual desire.

### Standard of Review

In a legal sufficiency challenge, we determine whether, viewing all evidence in the light

5

most favorable to the jury's verdict, any rational jury could have found the essential elements of the charged offense beyond a reasonable doubt. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Evidence may be legally insufficient when the record "contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Id*. (citing *Britain v. State,* 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (internal quotation omitted)). We may not re-weigh evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Further, we presume that the jury resolved any conflicting inferences from the evidence in favor of the verdict, and we do not substitute our judgment for that of the jury because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to their testimony. *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

**Aggravated Sexual Assault of a Child**

Pena argues in Issue Seven that the evidence was insufficient to prove that he penetrated J.M.'s sexual organ digitally. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i) (a person commits aggravated sexual assault if he intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means). In particular, he contends the evidence supporting the penetration element of the offense is insufficient because (1) at one point in her testimony, J.M. denied that Pena had touched the inside of her vagina; (2) Nurse Salazar's SANE report that J.M. reported that "he also put his fingers and it hurt" was ambiguous; and (3) Nurse Salazar did not make a medical finding about the state of J.M.'s internal genitalia.

6

We disagree, and we find that the evidence in the record is legally sufficient to support the penetration element of aggravated sexual assault of a child. Early in her testimony, J.M. testified that her father had touched her with his penis inside of her "front area," the part of her body she used to "pee." And when asked whether Pena had ever touched her "front area" with any part of Pena's body other than his penis, J.M. answered, "his hands." She also testified that he touched her with his hands "the same," and when read in context, "the same" being her "front area," or vagina. Having already described the manner in which Pena had put his penis inside her, J.M. indicated he had used his hands to touch her in the same place. Similarly, J.M. told Nurse Salazar that "he also put his fingers and it hurt" while pointing to her vaginal area and buttocks which meant "he also put his fingers *inside* and it hurt."

Although J.M. later replied "no" when asked if Pena had touched the inside of her vagina, her testimony read in context suggests that he had in fact done so; as such, we defer to the jury's resolution of J.M.'s inconsistent testimony and resolve the issue in favor of the jury's verdict. *See Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986) (the trier of fact has the responsibility to reconcile inconsistent or conflicting witness testimony, and it may choose to believe a portion of the testimony and reject other portions); *Williams*, 235 S.W.3d at 750. Further, since J.M. informed Solis, other school officials, and Salazar of the offense less than one year after the date of the alleged offense, her testimony alone is sufficient to support Pena's conviction for a sexual offense committed against her. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd).

We also consider Salazar's testimony regarding her SANE report, which indicated that bilateral abrasions found on J.M's vagina, while possibly consistent with causes other than

7

penetration, were not likely to be so because she observed none of the signs related to those causes during her examination of J.M.  On the contrary, Nurse Salazar testified that the injury was evidence of blunt trauma consistent with fingers being inserted into the vagina.  Salazar also testified that she wrote in her report that J.M. reported that Pena used his digits, or fingers, to penetrate her.   As such, this evidence supports the penetration element of the offense, and the jury was free to believe or disbelieve Salazar's findings made during her examination of J.M.  *See Losada,* 721 S.W.2d at 309.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support the penetration element of aggravated sexual assault of a child, such that a rational jury could have found that the State established this element beyond a reasonable doubt.  *See, e.g., Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992) (the slightest penetration of the female sexual organ is sufficient to prove penetration, even when the vagina is not entered); *Johnson v. State*, No. 08-06-00151-CR, 2008 WL 2175249, at *1, 3 (Tex. App.—El Paso May 22, 2008, no pet.) (not designated for publication) (child-victim's statements to SANE examiner that defendant "rubb[ed] against her private, [that] it did not feel very good," and that he put his hand "on top of or inside her private" constituted legally sufficient evidence to prove digital penetration element of aggravated sexual assault of a child); *Lopez v. State*, No. 08-05-00036-CR, 2006 WL 736976, at *4–5 (Tex. App.—El Paso Mar. 23, 2006, pet. ref'd) (not designated for publication) (evidence that defendant touched his "private part" with victim's "private part" and it hurt, combined with vaginal bruising, was legally sufficient to prove penetration).   Pena's seventh issue is overruled.

**Indecency with a Child by Sexual Contact**

8

Pena argues in Issue Eight that J.M.'s testimony that Pena forced her to "grab his private part" and "go up and down" and that she thought that "it was nasty" was legally insufficient evidence to support the intent element of the offense of indecency with a child by sexual contact. *See* TEX. PENAL CODE ANN. § 21.11(a)(1). In particular, he asserts that J.M. did not provide enough details through her testimony about the date this alleged incident occurred, how Pena was behaving during the incident, or the particular details about Pena's sexual organ showing that he became aroused during the alleged incident.

A person commits the offense of indecency with a child when he engages in sexual contact with a child younger than seventeen years of age, or causes the child to engage in sexual contact. *Id.* The offense requires proof of the intent to arouse or gratify the sexual desire of the defendant, but does not require proof that arousal or gratification actually occurred. *Caballero v. State*, 927 S.W.2d 128, 130 (Tex. App.—El Paso 1996, pet. ref'd). Thus, while Pena argues that there was no evidence showing that he was aroused during the commission of the alleged offense, the State was not required to prove that Pena became aroused or gratified at the time the offense occurred. *See id.*

Yet, intent may be inferred by a defendant's actions, and J.M. testified that Pena forced her to hold his sexual organ and "go up and down," supporting the rational inference that Pena intended to arouse or gratify himself by forcing J.M. to do so. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981) (for indecency with a child by contact offense, defendant's intent to gratify or arouse sexual desire may be inferred through defendant's conduct). Contrary to Pena's assertions, no oral expression of intent or visible evidence of sexual arousal is necessary to establish the arousal element of the offense. *See Scott*, 202 S.W.3d at 408. Again, the jury as

9

the fact finder was free to believe or disbelieve J.M.'s testimony that Pena forced her to touch his sexual organ and "go up and down," and giving the required deference to the jury's verdict, we conclude that her testimony is legally sufficient evidence to support the intent to gratify or arouse element of indecency with a child by contact. *See id*.; *see also Mendoza v. State*, No. 11-06-00260-CR, 2008 WL 2133084, at \*2 (Tex. App.—Eastland May 22, 2008, no pet.) (mem. op., not designated for publication) (child-victim's testimony that defendant made her put her hand on his private part and "move her hand up and down" was legally sufficient evidence to establish intent to gratify or arouse element of indecency with a child, reasoning that there was "no other logical explanation for his conduct"). Pena's eighth issue is overruled.

## EVIDENTIARY ISSUES

### Hearsay Issues

We next consider Pena's two issues concerning evidentiary matters. In Issues Ten and Twelve, Pena argues that the trial court abused its discretion by allowing witness testimony containing hearsay statements. In Issue Ten, Pena asserts that the trial court erred by allowing Detective Connor, one of the State's witnesses, to testify that Maria Guadalupe Pena, Pena's mother, told him that the bedsheets located in the Pena residence had been washed that day, and that this testimony constituted inadmissible hearsay evidence. In Issue Twelve, Pena argues that the trial court admitted hearsay statements from Principal Solis who testified about what J.M. had said to him about her father regarding his alleged physical abuse toward her.

### Applicable Law

A statement is hearsay if the declarant does not make the statement while testifying at the current trial, and the party offers the statement in evidence to prove the truth of the matter asserted

10

in the statement. TEX. R. EVID. 801(d). Statements containing hearsay are inadmissible unless an exclusion or exception to the general hearsay rule applies. TEX. R. EVID. 802. Yet, statements made outside of the court proceeding, but not offered for the truth of the matter asserted, are admissible. *Gholson v. State*, 542 S.W.2d 395, 398 (Tex. Crim. App. 1976). Likewise, out-of-court statements not offered for the truth of the matter asserted, but rather as impeachment evidence, are not hearsay and are admissible subject to other rules of evidence. *See*, *e.g.*, *Lund v. State*, 366 S.W.3d 848, 855 (Tex. App.—Texarkana 2012, pet. ref'd). Finally, "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is an "excited utterance" which is an exception to the hearsay rule. TEX. R. EVID. 803(2).

The trial court's decision to admit or exclude testimony, including testimony purportedly containing hearsay, is reviewed for abuse of discretion. *See Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994); *see also Knight v. State,* 457 S.W.3d 192, 201 (Tex. App.—El Paso 2015, pet. ref'd) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). We will uphold the trial court's decision to admit or exclude evidence if it falls within the zone of reasonable disagreement, and we afford "great discretion" to a trial court in its decision to admit evidence and give corresponding deference to its evidentiary decisions. *See Montgomery,* 810 S.W.2d at 378.

**Maria Guadalupe Pena's Testimony**

We first address Pena's tenth issue. At trial, Pena called Maria Guadalupe Pena to testify. On cross-examination, the State asked Ms. Pena if she had told police officers, who were executing a search warrant at her residence, that the bedding from the pull-out couch located in the Pena

11

residence's living room had been washed. Over Pena's hearsay objection, Ms. Pena denied making this statement to the officers, and testified that she told the officers searching her residence that the bedding set from the couch had not been washed. Later at trial, the State called Detective Regan Connor, who was involved in the investigation, to testify. When the prosecutor asked Detective Connor about the bedsheets that were located in the Pena residence's hallway, he testified over Pena's hearsay and improper impeachment objections that while he was at the Pena residence, Ms. Pena had told him that the bedsheets had been washed that day.

On appeal, Pena argues that the trial court erred by allowing Detective Connor to testify that Ms. Pena told him that the bedding had been washed that day, which he contends was an inadmissible hearsay statement not falling within an exclusion or exception to the hearsay rule. The State responds that Ms. Pena's out-of-court statement that the bedding had been washed was not hearsay because the statement was not being offered for the truth of the matter asserted in the statement, but rather for the purpose of impeachment by prior inconsistent statement. In other words, the State argues that Ms. Pena's testimony was not elicited to prove that the bedsheets were washed that day, but rather to impeach Ms. Pena with her prior inconsistent statement that she had told the officers at her home that the bedsheets had not been washed that day.

At first glance, Ms. Pena's testimony at trial that the bedding was not washed seems to be inconsistent with her out-of-court statement to Detective Connor that the bedding was, in fact, washed. Yet, Ms. Pena's testimony at the trial that the bedding on the *couch* had not been washed was not inconsistent with her previous out-of-court statement made to Detective Connor, who testified that Ms. Pena had told him that the bedding in the *hallway* had been washed. As the State admits, testimony and photographs established that the bedding from the couch with the stain

12

was still on the couch when it was photographed, and not in the hallway where other bedding was found. As such, Ms. Pena's testimony that the bedding on the couch had not been washed was not inconsistent with her previous statement that the bedding in the hallway had been washed, and the State did not properly offer the statement for impeachment purposes. *See* TEX. R. EVID. 613(b); *Flores v. State*, 48 S.W.3d 397, 404 (Tex. App.—Waco 2001, pet. ref'd) (in-court testimony that was not inconsistent with out-of-court statement was not properly offered for impeachment and thus constituted inadmissible hearsay).

Since the State improperly offered Detective Connor's testimony regarding Ms. Pena's out-of-court statement for impeachment purposes, and instead offered it for the truth of the matter asserted—that is, that the bedsheets had been washed—Ms. Pena's out-of-court statement that the bedding in the hallway had been washed was inadmissible hearsay, and the trial court erred in admitting Detective Connor's testimony. *See* TEX. R. EVID. 801(d); TEX. R. EVID. 802; *see Lopez v. State*, 86 S.W.3d 228, 230–31 (Tex. Crim. App. 2002) (en banc) (prior statement not shown to be false does not contradict in-court testimony and does not constitute proper impeachment); *Flores*, 48 S.W.3d at 404.

### Principal Solis's Testimony

In Issue Twelve, Pena argues that the trial court erred when it allowed Principal Solis to testify about what J.M. had told him during the initial outcry of physical abuse allegedly committed by Pena, arguing that J.M.'s statements were inadmissible hearsay not falling within an exception. The State counters that the trial court properly admitted Solis's testimony because the "excited utterance" exception to the hearsay rule applied, since J.M. was in an excited state when she was telling Solis about the alleged physical abuse.

13

We disagree with the State's contention that J.M.'s statements to Solis qualified as excited utterances within the meaning of TEX. R. EVID. 803(2). An excited utterance is "[a] statement *relating to* a startling event or condition, made *while* the declarant was under the stress of excitement that it caused." TEX. R. EVID. 803(2) (emphasis added). As Pena points out, J.M.'s excited state while talking to Solis was not related to the startling event or condition, i.e., Pena's actual commission of the alleged sexual offenses committed against her. Instead, J.M. was in an excited state because she was going through the stress of talking about a traumatic event, Pena's alleged sexual abuse toward her, and not as a direct result of the event itself. As such, J.M.'s statements did not fall within the excited utterance exception and constituted inadmissible hearsay, and the trial court abused its discretion in admitting Solis's testimony about J.M.'s out-of-court statements made to him. *Compare with Lupher v. State*, No. 05-00-01190-CR, 2002 WL 31057019, at *3 (Tex. App.—Dallas Sep. 17, 2002, no pet.) (not designated for publication) (child victim's statement made while she was very upset about a sexual assault that had occurred shortly before testifying witness heard it was an excited utterance within the meaning of the hearsay rule).

**Harm Analysis**

Having determined that Detective Connor's and Solis's testimonies contained inadmissible hearsay, we now consider both errors simultaneously to determine whether the cumulative impact of the errors in admitting the testimonies requires reversal. *See Davis v. State*, 104 S.W.3d 177, 182 (Tex. App.—Waco 2003, no pet.) (in applying the test for harmless error, "[w]e must view [each] error, not in isolation, but in relation to the entire proceedings"). Ordinarily, the erroneous admission of evidence is non-constitutional error to be reviewed under the harmless error standard set forth in TEX. R. APP. P. 44.2(b); as such, erroneous evidentiary rulings rarely rise to the level

14

of constitutional error. *Bagheri v. State*, 119 S.W.3d 755, 762–63 (Tex. Crim. App. 2003); *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). Pena does not argue that his constitutional rights were violated by either the erroneous admission of Detective Connor's testimony about Ms. Pena's hearsay statement, or Principal Solis's testimony regarding J.M.'s hearsay statements. Thus, we must consider whether the admission of the statements affected Pena's substantial rights, such that they exerted "a substantial and injurious effect or influence in determining the jury's verdict." *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005). Conversely, the error is harmless if, after considering the record as a whole, we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Bagheri*, 119 S.W.3d at 763. In doing so, we consider (1) the character of the alleged error and how it might be connected to other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error. *Id*.

Balancing these factors, we find that there is a fair assurance that the errors did not influence the jury, or had a slight effect, and thus the errors were harmless. First, Pena argues that Detective Connor's testimony was harmful because it allowed the jury to speculate about the forensic value of the unidentified source of the stain on the bedsheet. The stain could have been inferentially connected to other evidence tending to establish Pena's guilt in the case, such as the SANE exam or J.M.'s testimony; yet, the State iterated during closing argument that "nobody ever suggested that the orange sheet [on the couch] was washed. We're [talking] about the folded ones in the hallway." Thus, the likelihood that the jury would misinterpret Ms. Pena's hearsay statement or use it for an improper purpose was reduced, and this factor weighs against a finding of harmless error. Likewise, the existence of the orange bed sheet with an unexplained stain was

15

not a central issue at trial, and there was other properly admitted evidence tending to establish Pena's guilt, such as J.M.'s testimony and the presence of J.M.'s injuries established through the SANE examination.

Thus, the second and third *Bagheri* factors also weigh in favor of a finding that the error was harmless. *See Motilla v. State*, 78 S.W.3d 352, 359–60 (Tex. Crim. App. 2002) (error was harmless where erroneously admitted evidence was not related to the central issue in the case, and where there was other evidence in the record tending to establish the defendant's guilt); *Bagheri*, 119 S.W.3d at 763. Further, the record demonstrates that Ms. Pena's hearsay statement was not discussed again during the trial; as such, the State did not emphasize the error, and the fourth factor also suggests that the error was harmless. *See Motilla*, 78 S.W.3d at 359 (error was not emphasized where party did not mention complained-of testimony during closing arguments). Balancing the factors laid out in *Bagheri*, while the stain could have been connected to other evidence in the case, there is other evidence in the record supporting the verdict and tending to establish Pena's guilt, and the State did not emphasize the error. We therefore conclude that there is a fair assurance that the trial court's error did not influence the jury or had but a slight effect, did not affect Pena's substantial rights, and was thus harmless. *See* TEX. R. APP. P. 44.2(b); *Bagheri*, 119 S.W.3d at 763; *Motilla*, 78 S.W.3d at 359–60.

Turning to Principal Solis's testimony, Pena argues that his substantial rights were violated because the admission of Solis's statements had the effect of bolstering J.M.'s credibility, which was critical in this case. Thus, Pena contends that Solis's testimony that J.M. told him about Pena's alleged abuse toward her had a substantial or injurious effect on Pena because the jury would be more likely to believe that Pena was capable of sexual abuse if they believed he was

capable of physical abuse.   The State responds that the evidence was cumulative of other properly admitted evidence in the form of J.M.'s testimony, and thus any error was harmless.

We agree with the State that the trial court's error was harmless, in part because J.M.'s testimony establishing that Pena physically abused her was properly admitted at trial without objection.  *See, e.g., Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (error in admitting hearsay statements is harmless if other evidence proving the same facts was properly admitted elsewhere); *Luna v. State*, No. 05-06-00205-CR, 2007 WL 241164, at *3–4 (Tex. App.—Dallas Jan. 30, 2007, no pet.) (mem. op., not designated for publication) (erroneous admission of hearsay statements regarding child-victim's outcry was harmless where the same evidence was properly admitted elsewhere at trial).   The thrust of J.M.'s relevant testimony, which was admitted without objection, was largely the same as the hearsay statements contained in Solis's testimony, i.e., that Pena was physically abusive, punished her often, and hit her with his belt or his hand. As such, any error in the admission of this evidence was rendered harmless when the trial court properly admitted similar evidence without objection.  *See Anderson v. State*, 717 S.W.2d 622, 627-28 (Tex. Crim. App. 1986).

As for Solis's hearsay testimony not also established by J.M.'s testimony—that Pena forced J.M. to hold two bottles with her arms extended, and that she and J.P. would hide under the bed and would be punished by Pena when he found them—we find that the erroneous admission of this testimony was also harmless. While the existence of additional testimony establishing physical abuse could be connected to the charged sexual abuse offenses, the State did not emphasize the fact that J.M. was forced to hold bottles over her head or hide under the bed, and there was other evidence tending to establish Pena's guilt, such as J.M.'s properly admitted

17

testimony and her injuries established by the SANE examination. As such, we have a fair assurance that the erroneously admitted testimony regarding these statements did not affect the jury's verdict or had but a slight effect, and the admission of Solis's testimony did not affect Pena's substantial rights. *See Bagheri*, 119 S.W.3d at 763.

## Conclusion

In sum, while the trial court erred in admitting Detective Connor's and Solis's testimonies because they contained hearsay statements which did not fall within an exclusion or exception to the hearsay rule, the admission of their testimonies was harmless. Since the admission of the hearsay statements did not affect Pena's substantial rights, we must disregard these errors, even when the effects of the errors are considered together. *See* TEX. R. APP. P. 44.2(b); *Brooks*, 990 S.W.2d at 287; *Davis*, 104 S.W.3d at 182. Issues Ten and Twelve are overruled.

## Rule 401 and Rule 403 Issues

We next consider Pena's issues regarding the trial court's purportedly erroneous admission of evidence. In Issues Nine, Eleven, and Thirteen, Pena argues that the trial court abused its discretion by admitting certain evidence in violation of Texas Rules of Evidence 401 and 403. In particular, he argues in Issue Nine that the trial court erred in admitting photographs depicting a fitted bed sheet showing an unexplained stain under a reactive light because (1) the photographs were irrelevant pursuant to Rule 401, (2) their admission violated Rule 403 due to the likelihood that the jury would give the photographs undue weight in their decision-making, and (3) the photographs would distract the jury from the central issues in the case. Pena argues in Issue Eleven that the trial court erred in displaying J.M.'s underwear to the jury because doing so was unfairly prejudicial. Finally, Pena argues in Issue Thirteen that the trial court erred by allowing

18

Solis to testify that the case was "horrible and sinful beyond what [he] could imagine" because the statement was irrelevant and unfairly prejudicial. Before addressing these issues, we first discuss the applicable standard of review and Rules 401 and 403 generally.

**Standard of Review**

We review the trial court's decision to admit evidence under the same abuse of discretion standard set forth above. *Knight,* 457 S.W.3d at 204 (citing *Montgomery*, 810 S.W.2d at 391). As such, we will uphold the trial court's decision to admit or exclude evidence if it falls within the zone of reasonable disagreement, and we afford "great discretion" to a trial court in its decision to admit evidence and give corresponding deference to its evidentiary decisions. *See Montgomery,* 810 S.W.2d at 378.

**Rules 401 and 403**

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. TEX. R. EVID. 401. Relevancy is determined by whether a reasonable person, with some experience in the real world, would believe that the particular piece of evidence is helpful in determining the truth or falsity of any fact of consequence. *Montgomery*, 810 S.W.2d at 376. To be relevant, evidence does not have to conclusively prove or disprove a particular fact, but must only provide "a small nudge toward proving or disproving some fact of consequence." *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004).

Yet, relevant evidence may still be excluded by the trial court if its probative value is substantially outweighed by the danger of, *inter alia*, unfair prejudice, confusion of the issues, or misleading the jury. TEX. R. EVID. 403. To determine whether the trial court's actions violated

19

Rule 403, we must consider the following factors by weighing: "(1) the inherent probative value of the evidence and (2) the State's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency to confuse or distract the jury from the main issues, (5) any tendency to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be needlessly cumulative." *Knight,* 457 S.W.3d at 204 (quoting *Gigliobianco v. State,* 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

## Admission of Bedsheet Photographs

With the foregoing in mind, we first address Issue Nine, regarding the admission of the photographs showing a stain on the bedsheets collected from the Pena residence. During its case-in-chief, the State offered photographs of a fitted sheet found on the sofa bed where Pena purportedly committed the alleged offense. The trial court admitted the photographs over Pena's relevance and Rule 403 objections, and over his argument that the photographs would be misleading and could allow the jury to speculate that the stain was somehow related to sexual activity. Deputy Monica Alonzo, a crime-scene investigator with the El Paso Sheriff's Department at the time of the offense, testified that these photographs depicted the sheet under reactive lighting, which could not identify the kind of fluid which created the stain. Deputy Alonzo further testified that the stain was swabbed and tested for acid phosphatase and semen, which came back negative.

20

On appeal, Pena argues that the photographs were irrelevant because it would not have made any fact of consequence more or less likely than it would have been without the evidence, since the nature of the stain on the bedsheet could not be identified and the bedsheet tested negative for acid phosphate or semen. While the stain depicted in the photographs may have tested negative for acid phosphate or semen, making it less likely to have been connected to the offense, this fact does not render the photographs inadmissible because the evidence does not have to conclusively prove or disprove a particular fact, but only provide "a small nudge toward proving or disproving some fact of consequence." *Stewart*, 129 S.W.3d at 96. Thus, it was not a predicate for the relevancy of the photographs for the State to prove that the stain tested positive for acid phosphate or semen, or that they alone proved Pena committed the sexual offenses against J.M.; instead, the photographs themselves were sufficient to provide a "small nudge" toward establishing that Pena sexually assaulted J.M. on the bed. *See id*.

Likewise, the photographs were relevant because they depicted the scene of the alleged assault, which would have served to assist the jury in visualizing the crime scene and was probative of the circumstances related to the offense. *See Aguilar v. State*, No. 01-15-00972-CR, 2017 WL 3634248, at *7 (Tex. App.—Houston [1st Dist.] Aug. 24, 2017, pet. ref'd) (mem. op., not designated for publication) (photographs which serve to assist the jury in visualizing the crime scene were relevant and probative of the circumstances related to the offense) (citing *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999)). The photographs also provided a visual representation of Deputy Alonzo's testimony, and were relevant for that reason as well. *See id.*; *see also Cano v. State,* 3 S.W.3d 99, 110 (Tex. App.—Corpus Christi 1999, pet. ref'd). Thus, the trial court's decision to admit the photographs was within the zone of reasonable disagreement,

21

and we conclude it did not abuse its discretion by failing to exclude the photographs on relevancy grounds.

Pena also argues that the trial court violated Rule 403 by admitting the photographs because the photographs were misleading, and the jury was not equipped to evaluate the probative force of the stain on the bedsheet and could easily have given the photographs depicting the stain undue weight in their decision-making. He further asserts that the trial court erred in admitting the photographs because of the likelihood that the photographs would distract the jury from what he argues was the central issue in the case, which he contends was whether J.M.'s testimony was credible.

In this case, the photographs depicting the bedsheet were probative because they depicted possible evidence of the offenses alleged, i.e., that Pena sexually assaulted J.M. and those acts could have created stains on the bedsheet, and likewise assisted the jury in visualizing the crime scene and understanding the circumstances related to the charged offenses. *See Aguilar*, 2017 WL 3634248, at *8; *Williams v. State*, 82 S.W.3d 557, 562–63 (Tex. App.—San Antonio 2002, pet. ref'd) (depiction of a crime scene which was a visual representation of testimony describing the scene was not unfairly prejudicial). The State had need for the evidence because the photographs depicted possible stains related to the commission of the offense, even though they did not serve as conclusive evidence that the offense had occurred, and because they assisted the jury in understanding Deputy Alonzo's testimony regarding her investigation. *See Stewart*, 129 S.W.3d at 96; *Williams*, 82 S.W.3d at 562–63. On the other hand, the photographs were unlikely to cause the jury to make a decision on an improper basis or inflame its members' emotions because there was nothing emotionally charged or outrageous about the photographs depicting the

22

stain. Contrary to Pena's assertion that the main issue in the case was whether J.M. was credible, another critical issue was whether the offenses took place at all, and the stain was evidence tending to show that the offense could have taken place; thus, the risk of distracting the jury from the main issues in the case was low. Likewise, the jury was not likely to give the photographs undue weight because Deputy Alonzo had testified that the stains had not tested positive for acid phosphate or semen, thus providing the proper context to consider the photographs while limiting the jury's ability to assign more evidentiary weight to the photographs than they were worth. Finally, as the photographs took approximately a page-and-a-half in the reporter's record to develop through witness testimony, the presentation of the evidence did not take an inordinate amount of time, and the photographs were not unnecessarily cumulative of other admitted evidence.

Balancing the factors laid out in *Gigliobianco*, we conclude that the trial court's decision to admit the photographs did not amount to an abuse of discretion, such that its decision was outside the zone of reasonable disagreement. *See, e.g., Williams*, 82 S.W.3d at 562–63 (trial court's admission of video evidence depicting a crime scene which was corroborated by witness testimony did not violate Rule 403).

Even if the trial court abused its discretion in admitting the photographs of the stain on the bedsheet, we conclude that its action was harmless. *See* TEX. R. APP. P. 44.2(b) (errors not constitutional in nature and not affecting substantial rights must be disregarded); *Motilla*, 78 S.W.3d at 355 (substantial rights are not affected by the erroneous admission or exclusion of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not affect the jury, or had but a slight effect). In reviewing the record as a whole, we consider (1) the character of the alleged error and how it might be considered in connection with

23

other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of other evidence indicating guilt; and (4) whether the State emphasized the complained of error. *Bagheri*, 119 S.W.3d at 762–63.

In this case, the presence of the stains on the bedsheet was not a critical piece of evidence tending to establish Pena's guilt, especially because no incriminating semen or other bodily fluids were found on the bedsheet, and the record shows that this fact was explained to the jury. Likewise, there was other evidence tending to establish Pena's guilt, such as J.M.'s testimony and the presence of J.M.'s injuries detected during the SANE exam. Finally, the State did not emphasize the presence of the stain and did not substantially rely on it in its theory of the case. As such, we conclude that the error, if one occurred at all, was harmless and must be disregarded. *See* TEX. R. APP. P. 44.2(b); *Bagheri*, 119 S.W.3d at 762–63; *Motilla*, 78 S.W.3d at 355. Issue Nine is overruled.

### Display of Victim's Underwear

We next consider Issue Eleven, in which Pena argues that the trial court erred in allowing J.M.'s underwear, which was collected as part of the SANE examination, to be displayed to the jury. Pena argues that the trial court's actions had the potential to inflame the jury's passions, and the underwear itself lacked probative value. Again, Pena cites Rule 403 for these contentions.

At trial, the State offered the contents of an envelope containing items collected from the SANE examination, including J.M.'s underwear that she was wearing at the time of the examination. Without objection from defense counsel, the trial court admitted all of the envelope's contents, including the underwear. Shortly afterward, defense counsel objected to the State displaying the underwear to the jury, arguing that doing so would be inflammatory and a

24

violation of Rule 403. Although the underwear was already admitted into evidence, the trial court sustained the objection and prohibited the State from displaying the underwear to the jury, reasoning that the underwear was not probative since no identifiable DNA was collected from the underwear.

During the last day of its deliberations, the jury requested to open and examine all evidence that was closed and sealed, including the underwear collected during the SANE examination. Defense counsel again objected to displaying the underwear to the jury, arguing that doing so would be inflammatory and without probative value, and that displaying the underwear to the jury could allow its members to misinterpret the evidentiary meaning of the underwear. The State responded that its witness had testified that no seminal fluid was found on the underwear, and thus the risk that the jury would misinterpret the evidence was low. The trial court responded that it would instruct the bailiff to open the other contents of the envelope first, and then briefly display the underwear to the jury and remove it from the jury deliberation room, reasoning that the defense's objection was to "parading" the underwear in front of the jury and that it had previously sustained Pena's Rule 403 objection to displaying the underwear to the jury. Defense counsel objected to the trial court's planned course of action, which the trial court overruled. Although the record is not clear on this matter, the bailiff presumably carried out the trial court's order by briefly displaying the underwear to the jury and then removing it from the deliberation room.

On appeal, Pena raises the same Rule 403 objection he made at trial, i.e., that displaying the underwear to the jury was highly prejudicial while having low probative value, and that doing so could have allowed the jury to misinterpret the evidence. The State responds that the risk for unfair prejudice was unavoidable since the offense involved the sexual molestation of a child, and

25

that the risk for misinterpreting any unexplained stains, rips, or marks on the underwear was nonexistent because the presence of such characteristics on the underwear is not apparent from the record. Likewise, it argues that under Code of Criminal Procedure, article 36.25, the trial court could not have abused its discretion in ordering the bailiff to display the underwear to the jury because the trial court was statutorily required to furnish all admitted exhibits to the jury upon its request.

We conclude that the trial court did not abuse its discretion in ordering the bailiff to briefly display the underwear to the jury, and then directing the bailiff to remove it from the deliberation room. Cited by the State, article 36.25 reads, "[t]here *shall* be furnished to the jury upon its request *any* exhibits admitted as evidence in the case." TEX. CODE CRIM. PROC. ANN. art. 36.25 (emphasis added). Compliance with this statute is mandatory, and a trial court's failure to do so constitutes harmful error. *Parker v. State*, 745 S.W.2d 934, 936 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (citing *Lopez v. State*, 628 S.W.3d 82, 85 (Tex. Crim. App 1982) (panel op.)). Although Pena made a Rule 403 objection to the display of the underwear, the trial court admitted the underwear into evidence without objection, and thus it was evidence properly before the jury. Under the plain language of the statute's mandatory "shall" language, along with the language requiring "any" admitted exhibits to be displayed to the jury upon its request, the trial court was statutorily required to display the underwear to the jury when it requested it, and the trial court would have erred had it refused to do so. *See id.*; *see also Lopez*, 628 S.W.2d at 85 (it is error to refuse to allow the jury to examine admitted exhibits upon request). Thus, because the underwear was properly admitted into evidence without objection, we hold that the trial court did not err when it ordered the bailiff to briefly display the underwear to the jury, and then remove it from the jury

26

deliberation room. *See Parker*, 745 S.W.2d at 936; *Lopez*, 628 S.W.2d at 85.

Even if the trial court abused its discretion in displaying the underwear to the jury, we conclude that its action was harmless. *See* TEX. R. APP. P. 44.2(b) (errors not constitutional in nature and not affecting substantial rights must be disregarded); *Motilla*, 78 S.W.3d at 355. Again, to determine whether non-constitutional error, such as the erroneous admission of evidence, constitutes reversible error, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of other evidence indicating guilt; and (4) whether the State emphasized the complained of error. *Bagheri*, 119 S.W.3d at 762–63.

As the trial court noted, the defense was primarily concerned with "parading" the underwear in front of the jury, and the inflammatory effect doing so may have had. By limiting the jury's access to the underwear, the trial court's actions struck a balance of fairness because it complied with its statutory duty to furnish requested evidence to the jury, while insuring that the display of the underwear had minimal prejudicial effect and honoring its earlier ruling sustaining the defense's Rule 403 objection. We are further convinced that the error, if one occurred, did not influence the jury's decision or had but a slight effect. First, the presence of the underwear was not a critical piece of evidence tending to establish Pena's guilt, especially because no incriminating DNA evidence was found on the underwear, and the record does not show that there were unexplained stains which could mislead the jury. Likewise, there was other evidence tending to establish Pena's guilt, such as J.M.'s testimony and the presence of J.M.'s injuries detected during the SANE examination. Finally, the State did not emphasize the presence of the underwear and did not substantially rely on it in its theory of the case. As such, we conclude that

27

the error, if one occurred at all, was harmless and must be disregarded. *See* TEX. R. APP. P. 44.2(b); *Bagheri*, 119 S.W.3d at 762–63; *Motilla*, 78 S.W.3d at 355. Issue Eleven is overruled.

**Principal Solis's Testimony**

In Issue Thirteen, Pena argues that the trial court erred in allowing Principal Solis to testify that this case was unusual because it "was horrible and sinful beyond what [he] could imagine." In particular, he contends that Solis's statements were irrelevant and violated Rule 403 because the probative value of the statement was significantly outweighed by the risk of unfair prejudice.

The State called Solis to testify. On cross-examination, the defense called into question Solis's memory of the outcry and the accuracy of his testimony by questioning why he did not include in his written report certain facts he testified about at trial. Solis admitted that he "may be adding things in [to his testimony] that ... weren't in [his] statement before," such as his testimony that J.M. was shaking as she was speaking during the initial outcry. Defense counsel then suggested that the reason Solis was testifying about events not included in his report because "that's not exactly how it happened back then," but Solis disagreed. Defense counsel also suggested that Solis was remembering events not included in his report after his conversations with prosecutors, which Solis agreed with.

On re-direct examination, the State elicited testimony from Solis that he had encountered approximately forty to fifty cases of child abuse during his employment, and when the State asked whether any of those cases "st[u]ck out in [his] mind," Solis replied, "[n]ot like this one." When the State asked what Solis meant by this statement, defense counsel objected on the bases of relevance and Rule 403, which the trial court overruled. The State asked the question again, and Solis stated, "[the case] was unusual because, to me, what we later found out, to me, was horrible

28

and sinful beyond what I can imagine." The State then elicited testimony from Solis that he had thought more about the case and had attempted to recall more details about it, and that he had not included details about J.M.'s demeanor in his statement because he had not thought it was an important detail at the time. Afterwards, the State moved on to other topics, and Solis's statement at issue was never raised during the trial again.

On appeal, Pena argues that Solis's statement that the case was "horrible and sinful beyond what [he could] imagine" was irrelevant because it did not matter how this case compared to other instances of abuse that Solis had encountered, and because Solis's testimony did not provide a context by which to compare this case to other instances of child abuse he had encountered. Pena also argues that the admission of the testimony violated Rule 403 because the jury was not equipped to properly decide the probative value of the evidence, the testimony confused the issues by causing the jury to speculate about the other instances of abuse Solis alluded to, and the testimony elicited an improper emotional response from the jury. The State counters that Pena had "opened the door" to the testimony and invited a response to rebut those accusations by calling into question Solis's memory about the event and his truthfulness about his testimony regarding J.M.'s demeanor. It also argues that the statement was not unfairly prejudicial and did not violate Rule 403.

We first consider whether Pena opened the door to Solis's statements by attacking his memory of the event and the credibility of his testimony. A party opens the door to the admission of otherwise inadmissible evidence when he elicits testimony from a witness that invites the opposing party to respond. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). As such, a party's attempt to leave a false impression with the jury invites a response from the

29

opposing party to rebut that false impression. *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009).

Here, the defense attempted to undermine the credibility of Solis's testimony by insinuating that he had a poor memory of his conversation with J.M., and that he had fabricated his recollection about J.M.'s behavior during his testimony as a result of his pretrial conversations with the State. As the State points out, the defense opened the door to an attempt by the State to rehabilitate Solis's testimony on cross-examination by eliciting testimony regarding why he could recall this case in particular, and why he could recall more details during trial than he could when he gave his statement to the police. Even assuming the evidence was inadmissible, Solis's opinion that the case was particularly bad was evidence tending to negate the impression left by the defense that he had a poor memory of the event or that he had fabricated his testimony. As such, the trial court properly admitted the statement because the defense had invited a response to rebut the impression left on the jury that Solis had a poor memory of the event and was fabricating his testimony. *See id.*; *Williams*, 301 S.W.3d at 687.

Likewise, even assuming the defense had not opened the door to Solis's testimony, the trial court still did not abuse its discretion in admitting the testimony. The defense had made the statement relevant because it had attacked Solis's memory and credibility and made them an issue in the case, and Solis's testimony that the case was particularly bad to him made a fact of consequence more likely than it would have been without the testimony. *See* TEX. R. EVID. 401; *Hayden*, 296 S.W.3d at 554. Further, under the *Gigliobianco* factors set forth above, the admission of the testimony did not violate Rule 403. The testimony was probative of Solis's memory and credibility since it tended to establish that he remembered J.M.'s recollection of the

events and bolster his credibility, and also helped to establish J.M.'s credibility, which was a central issue in the case. In addition, the State had need for the testimony because the defense had attempted to attack Solis's memory and credibility, and the testimony helped to rehabilitate the witness's testimony and credibility. While Solis's testimony could have elicited an emotional response from the jury, it did not serve to distract from the main issues in the case, there is nothing to suggest that the jury could have given the statement undue weight, and the State did not spend an inordinate amount of time developing the testimony.

We conclude that the trial court's decision was within the zone of reasonable disagreement, and its decision to admit this relevant testimony did not violate Rule 403. *See Gallo*, 239 S.W.3d at 762 (the presumption exists that relevant evidence is not unfairly prejudicial); *see also Ford v. State*, 919 S.W.2d 107, 113, 116 (Tex. Crim. App. 1996) (trial court's decision to admit testimony by a witness that a crime scene was "horrible" was within the zone of reasonable disagreement, was not unfairly prejudicial, and did not violate Rule 403 because the testimony was relevant to issues in the case). Issue Thirteen is overruled.

### Testimony Regarding Purported Abuse of J.P.

In Issue Sixteen, Pena argues that the trial court erred by admitting testimony from two witnesses which suggested that Pena had physically abused J.M.'s brother, J.P. He contends that the testimony from each of these witnesses was irrelevant, unfairly prejudicial, contained inadmissible hearsay, and their admission violated the Confrontation Clause.

At trial, the State called Gloria Aguero, a CPS investigator, to testify. During her testimony, Aguero stated that she met with J.M. in 2008 in response to a report regarding potential child abuse that was submitted to CPS. This meeting took place approximately four years before

31

J.M.'s 2012 outcry associated with this case, but the case was ultimately closed and J.M. was not removed from her home. When the prosecutor asked Aguero who the "other person that [her] ... investigation involved," Aguero responded, "I believe it was her younger brother, [J.P.]." Defense counsel objected on the basis of relevance and Rule 403, which the trial court overruled. The prosecutor then discussed topics other than the purported physical abuse towards J.P., and the issue regarding Aguero's investigation involving J.P. was not raised again at trial.

Next, the State called Marcela Barraza who was previously employed as a detective with the El Paso County Sheriff's office. Over Pena's hearsay, Confrontation Clause, relevance, and Rule 403 objections, all of which the trial court overruled, Detective Barraza testified that J.P. made an outcry of physical abuse to her, but she did not specify who that outcry was made against. Detective Barraza's testimony regarding J.P.'s outcry was also not discussed again at trial.

### Relevance Argument

We first address Pena's relevance argument. Pena contends the testimonies suggesting J.P. was physically abused were "not relevant to prove sexual abuse of JM." We disagree. J.M. had testified that she was being physically abused at home, and the witnesses' testimonies suggesting her brother was being physically abused tended to support her testimony that she was also physically abused; thus, the testimonies tended to support J.M.'s credibility, which was an important issue at trial. As such, the testimonies that J.P. made an outcry of physical abuse tended to provide "a small nudge toward proving or disproving some fact of consequence," and the trial court did not abuse its discretion in admitting the testimonies over Pena's relevance objection. *See* TEX. R. EVID. 401; *Stewart*, 129 S.W.3d at 96.

### Rule 403 Argument

32

Pena also argues that the testimonies were "highly prejudicial [and] ... portrayed Pena as a bad father, an abusive father, and a bad person, in general." Given the lack of substantive analysis or citation to proper authority in Pena's brief, we could resolve this matter as being waived through inadequate briefing. *See* TEX. R. APP. P. 38.1(i); *Blanco v. State*, No. 08-15-00082-CR, 2017 WL 604050, at *5–6 (Tex. App.—El Paso Feb. 15, 2017, no pet.) (not designated for publication) (when a party's argument consists of conclusory statements and lacks substantive analysis, the party has inadequately briefed the issue and presents nothing for our review) (citing *Russeau v. State*, 171 S.W.3d 871, 882 (Tex. Crim. App. 2005)). In the interest of justice, we construe Pena's argument as being that the trial court violated Rule 403 by erroneously admitting the testimonies, whose probative values were outweighed by the risk of unfair prejudice, given that Pena made Rule 403 objections to the testimonies at trial and that argument is thus preserved for appellate review.

A trial court's decision to admit evidence in the face of a Rule 403 objection is analyzed under the *Gigliobianco* factors set out above. *Knight*, 457 S.W.3d at 204 (citing *Gigliobianco*, 210 S.W.3d at 641–42). Here, the witnesses' testimonies were probative because they tended to establish that children in the Pena home were physically abused, and they therefore supported J.M.'s credibility, a key issue at trial. As such, the State's need for the evidence was relatively high. Given the nature of the offenses and the graphic nature of the testimony elicited at trial, it is unlikely that testimonies establishing that J.P. made an outcry of physical abuse would tend to allow the jury to make a decision on an improper basis, such as emotion. Likewise, there was little chance that the testimonies would distract the jury from the main issues or be given undue weight by the jury because the allegations were not made against Pena in particular. Finally, the

33

testimonies did not take an inordinate time to develop, and only consisted of a few questions which together consisted of less than a full page of the reporter's record.

As such, we conclude the trial court did not abuse its discretion in overruling Pena's Rule 403 objection at trial, such that its decision was outside the zone of reasonable disagreement.

**Hearsay and Confrontation Clause Arguments**

Next, we consider Pena's hearsay and Confrontation Clause arguments. As a preliminary matter, we first address whether Pena preserved his hearsay and Confrontation Clause arguments regarding Aguero's testimony. *See Moore v. State*, 371 S.W.3d 221, 225 (Tex. Crim. App. 2012) (error preservation is a threshold issue because the correctness of trial court rulings must be preserved for appellate review). To preserve the issue for appellate review, a defendant arguing that the admission of testimony violated the Confrontation Clause must object at trial to its introduction in a timely and specific manner. TEX. R. APP. P. 33.1(a); *In Matter of E.H.*, 512 S.W.3d 580, 586 (Tex. App.—El Paso 2017, no pet.). Likewise, the arguments on appeal must comport with the objections made at trial. *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005). Confrontation Clause complaints are subject to the same preservation requirements as other issues. *Id*. at 179–80.

Here, when the State elicited testimony from Aguero that her investigation involved suspected abuse of J.P., the defense objected on the grounds of relevance and Rule 403, but not on Confrontation Clause or hearsay grounds. As they pertain to Aguero's testimony, we find that Pena's Confrontation Clause argument was not preserved for appellate review, and he has waived his right to make that complaint on appeal. *See* TEX. R. APP. P. 33.1(a); *In Matter of E.H.*, 512 S.W.3d at 586. Likewise, since Pena did not object at trial to Aguero's testimony on hearsay

34

grounds, his argument that Aguero's statement contained inadmissible hearsay was also not preserved for appellate review, and is also waived. *See* TEX. R. APP. P. 33.1(a).

Next, we turn to whether the admission of Detective Barraza's testimony that J.P. reported to her that Pena physically abused him contained inadmissible hearsay. Other than citation to the general rules related to hearsay, Pena's brief advances no argument whatsoever as to how Detective Barraza's statement contained inadmissible hearsay. As such, he has waived his hearsay argument on appeal and we decline to address it on the merits. *See* TEX. R. APP. P. 38.1(i); *Blanco*, 2017 WL 604050, at \*5–6 (citing *Russeau*, 171 S.W.3d at 882).

Finally, we address the contention that the admission of Detective Barraza's testimony violated the Confrontation Clause. Other than a citation to the general rules related to a Confrontation Clause analysis and a conclusory statement that Pena did not have the opportunity to confront J.P., Pena advances no argument as to how the testimony violated the Confrontation Clause, and for this reason alone the issue could be considered waived. *See* TEX. R. APP. P. 38.1(i). Yet even if we were to consider the argument on the merits, Pena has not argued, let alone established, that the outcry J.P. allegedly made to Detective Barraza was testimonial in nature. *See Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011) ("[T]o implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature.") (citing *Crawford v. Washington*, 541 U.S. 36, 50–52, 59, 124 S.Ct. 1354, 1363–65, 1368–69, 158 L.Ed.2d 177 (2004)). As such, he has not shown that the Confrontation Clause was violated through the admission of Detective Barraza's testimony, and his argument must fail. *See id*.

**Conclusion**

35

In sum, the trial court did not abuse its discretion in admitting the testimonies because they were relevant to show children in the Pena household were physically abused, and thus tended to support J.M.'s credibility. Neither did the trial court violate Rule 403 by admitting the testimonies because the probative value of the evidence was not outweighed by the risk of unfair prejudice. Pena did not raise a hearsay or Confrontation Clause objection to Ms. Aguero's testimony at trial, and has not preserved the error for appellate review. Further, Pena's argument that Detective Barraza's testimony consisted of inadmissible hearsay was inadequately briefed, and thus presents nothing for our review. Finally, Pena's contention that the admission of Detective Barraza's testimony violated the Confrontation Clause fails because he has not demonstrated that the statements were testimonial, and thus has not shown that the Confrontation Clause is implicated in this matter. Issue Sixteen is overruled.

### Exclusion of Defense Witnesses

Next, we consider Issues Seventeen, Eighteen, and Nineteen. Pena argues that the trial court erred when it excluded testimony from certain witnesses, which he contends effectively prevented him from presenting certain defensive theories at trial. In particular, Pena argues in Issue Seventeen that the trial court erred by excluding cross-examination testimony from J.M. that she was angry at her mother for leaving her with her father, which impaired his ability to present the defensive theory that J.M.'s anger issues were not due to Pena's alleged sexual abuse toward her. Pena argues in Issue Eighteen that the trial court erred by excluding testimony from Rube Arrelano, Pena's neighbor, and Ruth Pena, both of whom testified that J.M. had engaged in prior sexual contact with other children. He contends this error prevented him from presenting the defensive theory that these prior incidents were the source of J.M.'s sexual knowledge, and that

36

she did not learn this sexual knowledge through Pena's alleged commission of the charged offenses. Finally, Pena argues in Issue Nineteen that the trial court erred when it excluded testimony from Carlos Pena, J.M.'s grandfather, that J.M. was not being truthful about what had occurred with Pena, and that "she had [previously] told five lies."

## Standard of Review

The trial court's exclusion of evidence is reviewed under the same abuse of discretion standard set forth above. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007) (citing *Montgomery*, 810 S.W.2d at 391). If a trial court's evidentiary ruling excluding evidence is within the zone of reasonable disagreement and is correct under any theory of law applicable to the case, we will not reverse the trial court's decision. *Id.* (citing *Montgomery*, 810 S.W.2d at 391).

While the Sixth Amendment guarantees the right to present a defense, this right is not unlimited, and is subject to reasonable restrictions. *Potier*, 68 S.W.3d at 659. There are two circumstances where the improper exclusion of evidence may establish a constitutional violation: (1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence vital to his defense; or (2) when a trial court erroneously excludes relevant evidence that is a vital portion of the case and the exclusion effectively precludes the defendant from presenting a defense. *Ray v. State*, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005) (citing *Potier*, 68 S.W.3d at 659–62). Since the testimony at issue here was not categorically excluded by a rule of evidence, we are concerned only with the second category and must determine whether the exclusion of the witnesses' testimonies effectively prevented Pena from presenting a defense. *See id.*

## Exclusion of J.M.'s Testimony

We first address Issue Seventeen, in which Pena argues that the trial court erred when it did not allow his defense counsel to elicit testimony from J.M. about her purported anger toward her mother for leaving her with her father. At trial, defense counsel asked J.M. on cross-examination whether it made her angry that she had not lived with her mother for a long time, which J.M. answered affirmatively. Defense counsel again asked whether that fact had made her angry for a long time, which J.M. also answered affirmatively. When defense counsel asked whether J.M. was angry that "[her mother did not] have [J.M.] with her," the State objected on relevance grounds and the trial court sustained the objection. Defense counsel attempted to explain that this testimony would be relevant to show why J.M. had anger issues, but the trial court overruled this explanation, and defense counsel then moved on to other topics.

On appeal, Pena argues that he was deprived of the ability to present the defensive theory that J.M. had anger issues because her mother had left her, and not because Pena committed the alleged sexual offenses against her. Yet, the substantially same question had already been asked by defense counsel and answered by J.M. twice beforehand, and the trial court did not abuse its discretion in prohibiting the question from being asked and answered a third time. *See Winegarner*, 235 S.W.3d at 790 (if a trial court's ruling excluding evidence is within the zone of reasonable disagreement and is correct under any theory of law applicable to the case, we will not reverse the trial court's decision); *Williams v. State*, 566 S.W.2d 919, 925 (Tex. Crim. App. 1978), *overruled on other grounds by Rutledge v. State*, 749 S.W.2d 50 (Tex. Crim. App. 1988) (where similar questions are asked and answered without objection, the trial court's error in sustaining the State's objection to defense witness's testimony, if any, was harmless). As the State points out,

Pena was not prohibited from presenting evidence that J.M. was angry because she had not lived with her mother by being prohibited from receiving an answer to that question for a third time, and where that fact was established through other admitted testimony at trial. Thus, although the trial court sustained the objection to the question on relevance grounds, its ruling was within the zone of reasonable disagreement since the essentially same question had already been asked and answered twice before, and we conclude that no abuse of discretion occurred. *See Williams*, 566 S.W.2d at 925.

Finally, assuming the trial court erred in sustaining the State's objection to the proffered testimony, we have a fair assurance that the exclusion of this testimony did not affect the jury's decision, or had but a slight effect because the fact that J.M. was angry at her mother for not being with her had already been established through J.M.'s testimony. Thus, this evidence was before the jury and he was not completely deprived of the ability to present the theory that J.M. had emotional problems stemming from sources other than Pena's alleged sexual abuse toward her. *See Potier*, 68 S.W.3d at 666 ("[t]hat the defendant was unable to ... present his case to the extent and in the form he desired is not prejudicial where ... he was not prevented from presenting the substance of his defense to the jury"). Therefore, since we have a fair assurance that the trial court's ruling did not affect the jury's decision or had but a slight effect, the trial court's decision did not affect Pena's substantial rights and we must disregard the error, assuming one exists. *See* TEX. R. APP. P. 44.2(b); *Ray*, 178 S.W.3d at 835; *Potier*, 68 S.W.3d at 666. Issue Seventeen is overruled.

### Exclusion of Testimony from Ruth Pena and Rube Arellano

In Issue Eighteen, Pena argues that the trial court erred when it excluded testimony

regarding J.M.'s purported sexual contact with other children. At trial, Pena first called Ruth Pena, Pena's wife and J.M.'s stepmother, and attempted to elicit testimony from her that J.M. had engaged in inappropriate sexual behavior with her sisters. When defense counsel asked Ms. Pena whether J.M. had told her that "she had been having some kind of sexual contact with other individuals," and asked about what exactly Ms. Pena had discovered, the State objected on the grounds of relevance and improper character evidence. When the trial court sustained the objections, defense counsel stated that the testimony was being offered to impeach J.M.'s testimony that she had never had any sexual contact prior to Pena's alleged sexual contact with her. The trial court disregarded defense counsel's argument and stated that the question called for hearsay, again sustaining the State's objections. During defense counsel's subsequent bill of exceptions, he stated that he intended to elicit testimony that J.M. had engaged in sexual contact with her sisters, and that her testimony would have served to impeach J.M.'s purported testimony that the incident did not occur.

Pena later called Rube Arellano, Pena's neighbor, and attempted to elicit testimony from her that J.M. had engaged in sexual contact with her minor daughter. The State objected that the testimony called for details about "specific instances," presumably of J.M.'s past sexual history, and that it constituted improper character evidence. The trial court sustained the State's objection as to improper character evidence, and defense counsel subsequently elicited testimony from Arellano that an unspecified incident occurred with J.M. and her daughter which caused Arellano to keep J.M. away from her daughter. Defense counsel later made a bill of exceptions, stating that he intended to elicit testimony that J.M. had engaged in sexual contact with Arellano's daughter by giving her "hickeys" on her chest.

40

On appeal, Pena argues that Arellano's and Ms. Pena's testimonies would have shown that J.M. told her that she had engaged in sexual conduct with Arellano's daughter and J.M.'s sisters, and that J.M. thus obtained sexual knowledge from sources other than Pena's alleged sexual abuse toward her. We first address Arellano's proposed testimony. At trial, the State objected to the admission of this testimony because it constituted improper character evidence in violation of TEX. R. EVID. 404, and it constituted evidence of the victim's past sexual history in violation of TEX. R. EVID. 412. The trial court sustained the objection on the basis of improper character evidence.

Under Rule 412, specific instances of a victim's past sexual behavior are not admissible in prosecutions for sexual assault, subject to certain exceptions. TEX. R. EVID. 412(a)(2). Since Arellano's testimony was not subject to one of these exceptions, such as impeachment under Rule 609, the testimony was inadmissible. *See* TEX. R. EVID. 412(b). Likewise, the testimony was inadmissible under Rule 404 as improper character evidence because it was inadmissible under Rule 412. *See* TEX. R. EVID. 404(a)(3)(A) ("[i]n a criminal case, subject to the limitations in Rule 412, a defendant may offer evidence of a victim's pertinent trait"). As such, we conclude that the trial court did not abuse its discretion in excluding Arellano's testimony because it was inadmissible under Rules 404 and 412. *See* TEX. R. EVID. 412(a)(2) (specific instances of a victim's past sexual behavior are inadmissible in prosecution for sexual assault); TEX. R. EVID. 404(a)(3)(A) (evidence of a victim's pertinent trait is not admissible if it is inadmissible under TEX. R. EVID. 412).

Pena further claims that the trial court improperly excluded Ms. Pena's testimony that J.M. had previously told her that she had engaged in sexual contact with her sisters because it would have served to impeach J.M.'s testimony at trial, in which she denied the sexual incident with her

sisters occurred. Yet, Ms. Pena's testimony would not have served as proper impeachment evidence because J.M. did not testify that the incident with her sisters did not occur, but only that she did not remember it happening. Since Ms. Pena's testimony that the incident did occur was not inconsistent with J.M.'s testimony that she did not remember the incident, it could not have served to impeach her testimony. *See* TEX. R. EVID. 613. As such, Ms. Pena's testimony pertained to an out-of-court statement made by J.M. and was offered to prove the truth of the matter asserted, i.e., that J.M. had sexual contact with her sisters. Therefore, the trial court correctly concluded that Ms. Pena's proposed testimony constituted inadmissible hearsay and properly excluded it on that ground as well. *See* TEX. R. EVID. 801(d).

Even assuming the trial court improperly excluded the evidence, the record shows that Pena was not precluded from presenting the defensive theory that J.M. had sexual knowledge from sources other than Pena's alleged abuse since J.M. testified that she had once been under the bed where Pena and Ms. Pena were having sex, and that she had previously seen people having sex on television. Thus, Pena was not completely prevented from presenting the theory that J.M. had sexual knowledge originating from sources other than Pena's alleged sexual abuse toward her. Assuming the trial court erred by excluding Arellano's and Ms. Pena's testimonies, we again must disregard the purported errors because we have a fair assurance that the trial court's decisions did not affect the jury, or had but a slight effect, and thus Pena's substantial rights were not affected. *See* TEX. R. APP. P. 44.2(b); *Ray*, 178 S.W.3d at 835; *Potier*, 68 S.W.3d at 666. Issue Eighteen is overruled.

### Exclusion of Testimony from Carlos Pena

In Issue Nineteen, Pena contends the trial court erred when it excluded testimony from

Carlos Pena, J.M.'s grandfather, that J.M. had been dishonest about her allegations of sexual assault against Pena, and that this evidence served as impeachment evidence against J.M.'s testimony. On direct examination, defense counsel attempted to elicit testimony from Mr. Pena that J.M. told him that she had told "five lies," and that she had been "untruthful." The State argued that the testimony constituted inadmissible hearsay, and defense counsel responded that the testimony was offered for impeachment, not for the truth of the matter asserted in the statement. The trial court sustained the State's hearsay objection, but defense counsel did not make a bill of review as to what Mr. Pena's intended testimony consisted of. On appeal, Pena again advances the argument that Mr. Pena's testimony was being offered for impeachment, and that the trial court thus erred in sustaining the State's hearsay objection.

As a preliminary matter, since defense counsel failed to make a bill of exception with regard to Mr. Pena's proposed testimony that J.M. was being untruthful about the allegations of sexual abuse she made against Pena, he has not preserved this proposed testimony for appellate review and we disregard Pena's contention on appeal that Mr. Pena would have testified in this manner. *See* TEX. R. APP. P. 33.1(a); *London v. State*, 490 S.W.3d 503, 508 (Tex. Crim. App. 2016) (a defendant has the burden to ensure the record on appeal is sufficiently developed to resolve the issues presented, and a failure to do so precludes appellate review of a claim). Instead, we only review Mr. Pena's testimony contained in the record, i.e., that J.M. was being untruthful in a general manner. *See* TEX. R. APP. P. 33.1(a); *London*, 490 S.W.3d at 508.

Pena argues that Mr. Pena's testimony was being offered for impeachment, and therefore did not constitute inadmissible hearsay. Yet, he does not point to any particular testimony from J.M. that Mr. Pena's testimony would have impeached, and the record simply does not indicate

43

whether the "five lies" J.M. purportedly told relates to her testimony at trial regarding the allegations against Pena, or to some completely unrelated matter. Likewise, J.M.'s alleged statement to Mr. Pena that "she had been untruthful" could pertain to anything, and Pena does not direct us to any of J.M.'s testimony that Mr. Pena's testimony would have served to impeach. As such, the record is insufficiently developed and the issue is inadequately briefed for us to render a complete and thorough analysis on whether Mr. Pena's testimony was being offered as impeachment, not for the truth of the matter asserted in the statement. *See* TEX. R. APP. P. 38.1(i). We therefore construe J.M.'s purported out-of-court statements as being offered to prove the truth of the matter asserted in the statements, i.e., that J.M. told five lies and that she was being untruthful generally. As such, we conclude the trial court did not abuse its discretion in sustaining the State's hearsay objections at trial and excluding Mr. Pena's testimony. *See* TEX. R. EVID. 801(d).

Even assuming the trial court erred in excluding Mr. Pena's testimony, we conclude Pena was not harmed by the error because he was not prevented from presenting his general theory questioning J.M.'s honesty through other witnesses. For instance, Pena elicited testimony from J.M. on cross-examination that she stole money from Pena and Ms. Pena, and from Ms. Pena, J.M.'s counselor, and a forensic psychologist that J.M. would frequently lie, was diagnosed with conduct disorder, and frequently exhibited deceptive and manipulative behavior. More importantly, Pena himself challenged J.M.'s credibility as he testified in his defense that the allegations of sexual abuse did not occur.

We conclude that Pena was able to present testimony from multiple witnesses challenging J.M.'s credibility generally and with regard to her specific allegations. We fail to see how Pena was precluded from presenting his defensive theory that J.M. was, by inference, dishonest about

44

the allegations of sexual abuse made against Pena. Assuming the trial court erred by excluding Mr. Pena's testimony, we again must disregard the error because we have a fair assurance that the trial court's decision did not affect the jury, or had but a slight effect, and thus Pena's substantial rights were not affected. *See* TEX. R. APP. P. 44.2(b); *Ray*, 178 S.W.3d at 835; *Potier*, 68 S.W.3d at 666. Issue Nineteen is overruled.

## PROCEDURAL ISSUES

In Issues One, Two, Three, Four, Five, Six, Fourteen, and Fifteen, Pena asserts a variety of procedural issues. We will address these issues by topic and proceed out of numerical order.

### Disclosure of *Brady* Materials

In Issues Five and Six, Pena argues that the State violated his due process rights when it disclosed purported *Brady v. Maryland* material during the trial. On July 27, 2015, the State filed its first notice of *Brady* material (referred to as Brady-1). These records were submitted for *in camera* review on September 29, 2015, and the trial court entered an order finding that the documents did not contain *Brady* material on June 8, 2016, two days before the trial's voir dire began. On the first two days of the guilt-innocence phase of the trial, June 13–14, 2016, the State filed its second and third notice of *Brady* material (Brady-2 and Brady-3), respectively. An hour after the State filed Brady-3, the defense filed a written motion for a continuance, requesting a week to investigate the recently disclosed material.

Pena advances two issues related to these three disclosures. In Issue Five, Pena argues that the State's untimely disclosure of *Brady* material resulted in the defense's inability to effectively use the evidence to impeach J.M. In Issue Six, Pena contends that the trial court erred when it failed to give the defense additional time to investigate, interview, and subpoena

45

impeachment witnesses disclosed by the State during the trial.

## *Brady* Allegations

We first address Issue Five, whether the State violated Pena's due process rights by the disclosure of alleged *Brady* material during the trial. To establish a *Brady* violation, an appellant must show that (1) the State was in possession of evidence and suppressed the evidence, irrespective of the State's good faith or bad faith in doing so; (2) the suppressed evidence is favorable to the defendant; (3) the suppressed evidence is material, and that there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different; and (4) the evidence central to the *Brady* claim is admissible in court. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011). The State's obligation to reveal *Brady* material to the defense attaches when the information comes into the State's possession, whether or not the defense requested that information. *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). Favorable evidence is that which, if disclosed and used effectively, may make the difference between conviction and acquittal, and includes both exculpatory and impeachment evidence. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

On review, we note that Brady-1 material contained information that J.M. had made an allegation of sexual abuse against an unknown party while staying at a group home in Lubbock, Texas. Pena contends that the records related to Brady-1 did not contain the name or contact information of the person J.M. made an outcry against, and that the defense did not have access to these records and could not obtain them on its own. In its order finding that the materials contained in Brady-1 did not constitute *Brady* evidence, the trial court stated that "Attachment

46

'A'" consisted of audio recordings of interviews with employees of the treatment facility where J.M. and J.P. were living at one point, which did not include any mention of J.M. or her brother, J.P.; the trial court further stated that "Attachment 'B'" contained a PDF of records for J.M. and several other children. The trial court stated in its order that all material contained in both attachments was unrelated to the case. Pena does not point to any evidence contradicting the trial court's finding. Thus, we conclude that he has not met his burden in establishing that the evidence was favorable or material, or that the evidence would be admissible in court. *See Brady*, 373 U.S. at 87; *Pena*, 353 S.W.3d at 809; *see also Garcia v. State*, No. 08-02-00085-CR, 2004 WL 1895184, at *10 (Tex. App.—El Paso Aug. 25, 2004, pet. ref'd) (mem. op., not designated for publication) (where claimed *Brady* evidence is not in the record, nothing is presented for an appellate court's review and an appellant does not satisfy his or her burden in showing that the evidence is favorable or material).

Brady-2, which was disclosed during the morning of the first day of the guilt-innocence phase, contained information that (1) former detective Maricela Barraza, who had been involved in the investigation of the case and later became J.M.'s foster parent, reported that J.M. had threatened to harm herself and occasionally engaged in manipulative behavior; (2) J.M. was admitted for treatment to University Behavioral Health (UBH) and another psychological treatment center; and (3) Detective Barraza was unable to leave J.M. alone with male members of her family because she worried about J.M. making a false outcry of abuse against them. Pena argues the State had possession of this information, basing this argument on his assertion that Detective Barraza "was pre-trialed more than once" and that the "topic of fostering JM most certainly came up in those conversations[.]" Yet, Pena points to nothing in the record to support

47

these contentions. While this evidence could have constituted impeachment evidence favorable to the defense which could have led to a reasonable probability that the outcome of the trial would have been different, there is nothing in the record to affirmatively show that the State previously had possession of this evidence and failed to turn it over to the defense. *See Harm*, 183 S.W.3d at 406–07 (*Brady* does not require the State to disclose exculpatory evidence that the State does not have in its possession and that is not known to exist). Without more, we cannot say that Pena has satisfied his burden in establishing that the State had possession of this information and failed to turn it over to the defense. *See id*. Likewise, Pena has not established that this evidence would have been admissible either, and thus the claimed violation regarding Brady-2 must fail for this reason as well. *See Pena*, 353 S.W.3d at 809.

Brady-3, which was disclosed later during the second day of the guilt-innocence phase, contained information that (1) while J.M. resided in the foster home of the Singh family, she was removed from their care at their request because they were not able to handle her poor behavior; (2) J.M. had made an outcry of physical abuse against the Singhs, and that J.M. had made an outcry against one of the other foster children who had allegedly abused her or J.P.; and (3) a potential witness in the case, Deputy Rafael Chavez, was under investigation concerning an allegation of official oppression. Again, Pena does not point us to anything in the record establishing that the State was in possession of this information other than stating that the "CPS workers involved in this case were likely pre-trialed more than once." We cannot say that Pena has satisfied his burden in establishing that the State had possession of this information and failed to turn it over to the defense. *See id*. Even if the State had possession of this information, Pena has likewise not met his burden in establishing that the evidence was admissible or that a reasonable probability that

48

the outcome of the trial would have been different because there is nothing in the record to suggest that the accusations against the Singhs or the other foster children were false, and because Deputy Chavez was not called as a witness during the trial. *See id.*; *see also Rodriguez v. State*, No. 02-14-00377-CR, 2015 WL 7717204, at *3 (Tex. App.—Fort Worth Nov. 25, 2015, pet. ref'd) (mem. op., not designated for publication) (evidence that a child accused someone other than the defendant of sexual abuse is not relevant or admissible absent evidence that such accusations were false).

In sum, we conclude that the defense failed to meet his burden to establish the *Brady* factors as to each of the three *Brady* disclosures. First, with Brady-1 material, Pena failed to establish that the evidence was favorable or material, or that the evidence was admissible. Second, with Brady-2 material, Pena failed to establish that the State had possession of the evidence and failed to disclose it, or that the evidence would have been admissible. Finally, with Brady-3 material, Pena failed to establish that the State had possession of this evidence, that the evidence would have been admissible, or that the outcome of the trial would have been different had the evidence been turned over to the defense. *See Pena*, 353 S.W.3d at 809-10. Issue Five is overruled.

### Ruling on the Motion for Continuance

We now turn to Issue Six, regarding whether the trial court abused its discretion by failing to grant the defense a week-long continuance to allow the defense to investigate the purported *Brady* material disclosed by the State during the trial. After the State filed Brady-3 on the second day of trial, the defense filed a written motion for a continuance, requesting a week to investigate the recently disclosed material. After a bench conference, the trial court stated it was not yet convinced that the late disclosure of *Brady* material prevented defense counsel from presenting its

defense, and it would not rule on Pena's motion for a continuance at that time. Defense counsel replied that "even a day['s] continuance would help us to ... figure out whether it's going to help us or not." After defense counsel asked for a "short break" to review the recently disclosed material, the trial court responded that it may grant a continuance later in the trial, but again refused to rule on Pena's motion and stated that it wanted to proceed in the interest of concluding the trial that week. Defense counsel did not object to the trial court's decision to not rule on the issue.

During a bench conference at approximately 3:25 p.m. the next day, defense counsel stated, "I'm going to re[-]urge my continuance, Your Honor. And I'm only re[-]urging for the afternoon." Later during the same bench conference, defense counsel again asked for a continuance for the rest of the afternoon of June 15, 2016. The trial court then granted the defense's request and announced that court would be in recess until 8:30 a.m. the following morning. Again, defense counsel did not object to the trial court's decision not to rule on Pena's motion for a longer continuance.

On appeal, the State argues that Pena waived his right to complain about the trial court's denial of his original request for a week-long continuance because he abandoned it by later requesting that the trial court continue the trial only for the period of that afternoon, which the trial court subsequently granted. It also argues that Pena waived his right to raise the issue on appeal because he failed to pursue an adverse ruling from the trial court on the issue. We agree.

A defendant's failure to pursue an adverse ruling to his objection forfeits his right to complain about the issue on appeal. *See* TEX. R. APP. P. 33.1; *Mathis v. State*, 67 S.W.3d 918, 927 (Tex. Crim. App. 2002); *see also Tucker v. State*, 990 S.W.2d 261, 263 (Tex. Crim. App. 1999) (a party who properly preserves a complaint for appellate review may waive or forfeit the

complaint at another time). Here, Pena initially requested a week-long continuance, but later repeatedly asked for a continuance lasting only for the afternoon of June 15, 2016, which the trial court granted. He likewise did not pursue an adverse ruling from the trial court on its decision to not rule on the motion. As such, we hold that Pena waived his ability to complain about the issue on appeal when he requested and then acquiesced to the trial court's action, and by failing to pursue an adverse ruling on his objection. *See* TEX. R. APP. P. 33.1; *Dunn v. State*, 819 S.W.2d 510, 525 (Tex. Crim. App. 1991) (defendant failed to preserve issue for appellate review when he acquiesced to the trial court's action contrary to his complaint).

Likewise, even if the error was preserved for review and the trial court erred by failing to grant a week-long continuance, the rule of invited error may serve to waive a party's complaint on appeal by estopping the party from complaining on appeal about an alleged error that it induced at trial. *See Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999). In this case, defense counsel initially made a written request for a continuance of one week, and then later repeatedly requested a "short break" and for a continuance lasting for the remainder of the afternoon of June 15, 2016 instead. The trial court granted defense counsel's later request by adjourning the trial after 3:25 p.m. on that day, going into recess until the following morning. Under the rule of invited error, we conclude Pena is estopped from complaining on appeal about the trial court's decision to only grant a continuance for the afternoon of June 15, 2016 when Pena's trial counsel induced the trial court's action, and the trial court granted his request. *See id*. As such, we decline to consider Pena's issue on the merits. *See id*. at 531–32. Issue Six is overruled.

**Voir Dire Issues**

We now turn to Pena's voir dire issues. In Issues One, Two, and Three, Pena argues that

51

the trial court abused its discretion by limiting the defense's voir dire examination.   In particular, he argues that the trial court erred by (1) imposing unreasonable time limits on his voir dire examination, (2) that this restriction denied him the opportunity to question the venire members on proper areas of inquiry, and (3) that the restriction limited his effective use of peremptory challenges and challenges for cause.

## Standard of Review

The conduct of voir dire rests largely with the sound discretion of the trial court.   *Cantu v. State*, 842 S.W.2d 667, 687 (Tex. Crim. App. 1992).   As such, a trial court's decision to deny a party's request for additional time for voir dire is reviewed for abuse of discretion.   *Id*.   A trial court abuses its discretion when it prohibits a proper question during voir dire about a proper area of inquiry.   *Sells v. State*, 121 S.W.3d 748, 755–56 (Tex. Crim. App. 2003).   A question is proper if it seeks to discover a juror's views on an issue applicable to the case.   *Id*. at 756.   Nevertheless, a trial court may impose reasonable time limits on voir dire; otherwise, voir dire could continue indefinitely.   *Id*. at 755; *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).

## Restriction of Defense Counsel's Time for Voir Dire

To show that a trial court abused its discretion in limiting a party's voir dire examination, the party must show that (1) counsel did not attempt to prolong voir dire, and (2) counsel was prohibited from asking proper voir dire questions.   *Arredondo v. State*, No. 08-08-00226-CR, 2010 WL 337678, at *1 (Tex. App.—El Paso Jan. 29, 2010, pet. ref'd) (not designated for publication) (citing *McCarter v. State*, 837 S.W.2d 117, 119 (Tex. Crim. App. 1992)).   In addition, a party must preserve an alleged error in denying voir dire questions for appellate review by showing that "he was prevented from asking *particular* questions that were proper."   *Sells*, 121

52

S.W.3d at 756 (emphasis in original). The denial of questions regarding a general area of inquiry is "not enough" to preserve the error for review because the trial court might have allowed the proper question had it been submitted for the court's consideration. *Id*. Likewise, a party's right to ask questions is limited; for example, parties may not go on "fishing expeditions" by asking questions such as "can you be fair and impartial under a given set of facts," which do not provide any concrete information for the intelligent use of peremptory or for-cause challenges. *Barajas*, 93 S.W.3d at 41.

In this case, prior to the beginning of voir dire, the trial court asked the parties approximately how long they would need for their voir dire examinations. The State requested an hour-and-a-half for its examination and reminded the court that the panel included one hundred and seventy-five venire members. The court responded that it felt one hour would suffice initially "to cover a lot of ground, because by an hour, I'm going to start to get antsy, and then at an hour and 15, I might say, 'You're at an hour and 15.'" The court further added, "if you're making good use of your time, I probably will not say anything again until an hour and a half. But if you're not, then I'm going to start bugging you." Pena's trial counsel followed these remarks with his agreement that an hour and a half was needed at minimum, but then stated, "I was thinking two hours, at least." The trial court replied that that was "[n]ot going to happen" and the parties should plan for having an hour-and-a-half at most unless the panel is really talking or there are many objections.

When the State's voir dire reached an hour, the trial court commented, "You're at an hour." Eighteen minutes later, the State completed its examination. During the examination by defense counsel, the trial court interjected "you're out of time, so what else do you have?" When defense

53

counsel replied that he wanted to ask about "language, photos" the court advised that the State had already covered those topics, and did he have something new. Defense counsel replied, "[p]olice officer credibility," the "Fifth Amendment," and the "range of punishment on indecency with a child." After these topics were listed and some back-and-forth, the trial court first stated it would allow an additional ten minutes then extended the time to an additional fifteen minutes. The court advised, "You've wasted a lot of time and taken a lot of time that you could have gone faster." Defense counsel responded that he had "gotten strikes" as people were speaking up. Returning to his examination, defense counsel spoke about contrasting the range of punishment of the indecency with a child charge as compared to his earlier discussion of the punishment range for aggravated sexual assault of a child. Counsel described the lesser charge as having a range of punishment of two to twenty years for acts including touching of the genitals of the child, or the child touching the genitals of the adult male, with the intent to arouse. Focusing on individual venirepersons, defense counsel asked each person he called either by their juror number, or their name, or both, whether he or she could consider the minimum of two years on the offense charged. After he spoke to more than thirty individuals, the court called time. All but two individuals responded simply with a "yes," thereby indicating they could consider the minimum punishment of two years for an indecency charge.

As for the two that responded differently, venireperson Salido responded that he needed to hear the facts first. Defense counsel explained he could not give him facts and repeated his question about whether the venireperson could consider the minimum of two years having found someone guilty of indecency with a child. He then responded, "Yes." Defense counsel repeated, "You could consider it?" Again, the panel member said, "Yes." Second, venireperson 81 asked

54

for the question to be repeated then responded, "No." Defense counsel asked him a second time, "you could not?" Number 81 repeated his response of "No." Defense counsel then continued, and after he called on venireperson 175, the trial court stated, "That's time, Mr. Morales. You used more than 15 minutes, and you didn't make good use of your time."

Once the venire panel exited for a break, the trial court and defense counsel engaged in some back-and-forth discussion regarding the efficiency of defense counsel's voir dire, and defense counsel expressed his belief that he had not been given sufficient time to conduct his examination. The trial court and defense counsel voiced competing recollections of the amount of time that the State and defense were given for their examinations:

[Defense counsel]: . . . I believe that the State went from about 1:00 to about 2:30.

[Trial court]: No, sir.

[Defense counsel]: And I started at about -- they went from about 1:00 to 2:15, 2:20. I'm not sure exactly when. We took a break, came back at 2:30 or so, I'm not sure on the exact time, and now it's 3:40, and so not only did I get less time --

[Trial court]: You did not get less time.

[Defense counsel]: So what were the times, Your Honor, as far as the -- we did start at 1:00. It's now 3:40, and I know the State -- and I'm not saying the State went long. I'm not criticizing the State for anything they did, but I know they went over an hour.

[Trial court]: So the record is clear, you may have had the same amount of time, but you didn't make good use of your time. When I told [the

55

prosecutor] the same thing, she wrapped it up; when I told you you're not making a good use of your time, you decide to still delay. So that's your choice. That's fine if you want to make a record, but we need to get this going.

[Defense counsel]: There was no intent to delay. And I understand --

[Trial court]: I think there was an intent to delay, and that's my finding. So you want to make a record, what else did you have? Quickly, because this is your time.

[Defense counsel]: Okay. I needed to ask the jurors whether they were going to hold it against the defense if we were aggressively cross-examining the complainant in this case.

[Trial court]: So that the record is clear, that was not a question you told me you still needed to ask.

The trial court also stated that defense counsel had used one hour and four minutes of time before the court interjected, then allowed an additional 15 minutes. The trial court contrasted that examination with the one hour and eighteen minutes of time given to the State. The court repeated it had observed that defense counsel did not use time wisely. After defense counsel made a bill of exception with the additional questions he had wanted to ask, the court and parties proceeded without incident with a second round of voir dire with another panel.

On appeal, Pena contends that the trial court abused its discretion in limiting the amount of time for his voir dire, and that this in turn inappropriately limited his ability to explore relevant areas of voir dire topics and resulted in his inability to effectively use peremptory challenges and

56

challenges for cause. The State counters that Pena did not properly preserve this issue for appellate review because his request for additional time to ask questions was framed as a request to explore the jury's thoughts on improperly broad topics, such as "police officer credibility" and the "Fifth Amendment," as opposed to a request for more time to ask more specific questions. In particular, the State cites *Sells*, 121 S.W.3d at 756, for the proposition that an appellant must show he was prevented from asking particular questions to preserve the error for review, and that being prevented from asking about a general area of inquiry is insufficient to preserve the error.

We find most of the defense counsel's questions were not properly preserved for appellate review. To properly preserve the issue for review, an appellant must show that the questions were sufficiently particular, *and* that they were proper. *Id*. Here, defense counsel initially asked for additional time to ask questions regarding police officer credibility, the Fifth Amendment, and the range of punishment on indecency with a child. After the conclusion of his voir dire examination, defense counsel then provided a record of questions he wanted to ask but was prevented from asking by the court's ruling:

(1) whether the jury could fairly consider the case if defense counsel aggressively cross-examined the complainant;

(2) whether the jury could fairly consider the case where photographs of a child's vagina or anus might be presented;

(3) whether the use of words such as "vagina," "anus," and "penetration," would preclude them from deciding the case fairly;

(4) whether the jury could fairly decide the case if Pena did not testify;

(5) whether the jurors would assume the presence of sexual abuse where evidence

57

of physical abuse was presented;

(6) whether the jurors would convict a defendant of sexual abuse if the State failed

to prove sexual abuse but proved physical abuse;

(7) whether it is acceptable to hit a child; and

(8) about police officer credibility generally.

Questions One, Two, and Three were "ability to be fair" questions which amount to improperly broad "fishing expeditions" which were not sufficiently specific to constitute proper questions. *See Barajas*, 93 S.W.3d at 41. Questions Five and Six were improper commitment questions. *See Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001) ("[c]ommitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact"). Questions Seven and Eight were not particular enough to preserve the questions for review. *See Sells*, 121 S.W.3d at 756. Thus, these questions were improper and were not preserved for appellate review. *See id*.

Nonetheless, even if these questions were preserved for appellate review, we conclude that the trial court's refusal to allow the defense more time for its voir dire examination did not amount to an abuse of discretion. For the reasons stated above, most of these questions were improper because they were "ability to be fair" questions, improper commitment questions, or not sufficiently particular; thus, the trial court did not err in precluding defense counsel from asking them. *See id*. The only proper question, Question Four, regarding whether the panel could fairly decide a case where the defendant had not testified, was a question defense counsel had already covered with panel members, row by row, when he discussed the absence of a burden of proof on defendant and his right to remain silent. *See Chakravarthy v. State*, 516 S.W.3d 116, 129–30 (Tex.

App.—Corpus Christi 2017, pet. ref'd) (mem. op.) (trial court did not abuse its discretion where it prevented the defense from asking a question related to the defendant's Fifth Amendment right not to testify, and the question had been previously asked by the trial court or the State).

In addition, the record shows that after the voir dire of defense counsel reached one hour of duration, the trial court gave defense counsel an additional fifteen minutes to ask questions related to his additional areas of inquiry. On the record before us, the time given to defense for its voir dire equaled or exceeded the time given to the State. Despite the disagreement about the precise amount of time that each side was afforded, the trial court made a specific finding that defense counsel intentionally delayed voir dire by inserting "a lot of pauses in between" his questioning and with revisiting a question even after receiving a response. The court described that defense counsel failed to obtain a simple yes or no from jurors by number, and instead used his time unwisely by re-stating a second time after receiving an answer a comment such as "[y]ou couldn't consider?" Affording proper deference to the trial court's finding in light of the facts put forth on the record before us, we are unable to say that the trial court abused its discretion in limiting the amount of time that Pena had for voir dire examination based upon its explicit finding that he intentionally prolonged voir dire. *See McCarter*, 837 S.W.2d at 119 (to show a trial court abused its discretion in limiting a party's voir dire examination, the party must show that (1) counsel did not attempt to prolong voir dire; and (2) counsel was prohibited from asking proper voir dire questions).

Trial counsel has a duty to reasonably budget his time, and a trial court's decision to limit counsel's voir dire where he fails to do so does not constitute an abuse of discretion. *See id.*; *Schott v. State*, No. 03-11-00446-CR, 2013 WL 1876535, at *5 (Tex. App.—Austin Apr. 30, 2013, no

59

pet.) (mem. op., not designated for publication); *Tamez v. State*, 27 S.W.3d 668, 672 (Tex. App.—Waco 2000, pet. ref'd). No abuse of discretion occurs where the trial court is generous with the time given to both parties and there is evidence that defense counsel delayed his voir dire examination. *See McCarter*, 837 S.W.2d at 119; *Chakravarthy*, 516 S.W.3d at 130. Since the record shows that the trial court extended the time given to both parties after providing a warning at the one-hour mark, and that defense counsel for Pena delayed his voir dire examination by proceeding in an inefficient manner and intended to ask improper voir dire questions, we conclude that the trial court did not abuse its discretion in limiting Pena's voir dire examination. *See McCarter*, 837 S.W.2d at 119; *Chakravarthy*, 516 S.W.3d at 129–30; *see also Arredondo*, 2010 WL 337678, at *2–3 (trial court did not abuse its discretion in limiting defense counsel's time for voir dire where counsel spent an inordinate amount of time on few issues and thus prolonged his voir dire).

Issue One is overruled.

**Restriction of Defense Counsel's Ability to Ask Questions or Use Challenges**

Since the trial court did not err by limiting defense counsel's voir dire examination, we further conclude that the trial court's limit of Pena's time for voir dire did not inappropriately restrict his ability to ask questions regarding relevant areas of voir dire inquiry, or inappropriately restrict his ability to utilize peremptory challenges and challenges for cause. *See Chakravarthy*, 516 S.W.3d at 130 (finding no abuse of discretion by the trial court regarding the defense's abilities to ask certain questions or use peremptory challenges and challenges for cause where trial court did not err by limiting the defense's time for voir dire).

Issues Two and Three are overruled.

## Motion for a New Trial

In Issue Four, Pena argues that the trial court abused its discretion when it failed to hold a hearing on his motion for a new trial. He contends that the trial court erred because (1) the jury had received evidence not presented at trial after deliberations had started; (2) a juror withheld information that she was a sexual abuse victim; (3) evidence disclosed by the State during trial could have been used by the defense; and (4) the State presented perjured testimony during the trial.

In response, the State counters that because Pena's motion for a new trial did not contain a request for a hearing on the motion, the trial court was not required to hold a hearing and did not abuse its discretion in failing to do so, citing for that proposition *Ramos v. State*, No. 01-01-00980-CR, 2003 WL 164456, at *1 (Tex. App.—Houston [1st Dist.] Jan. 23, 2003, pet. ref'd) (mem. op., not designated for publication). In *Ramos*, the defendant filed a motion for a new trial alleging ineffective assistance of counsel, and the trial court denied his motion without holding a hearing on the motion. *Id*. The motion itself did not contain a request for a hearing on the motion, but only requested a new trial. *Id*. Our sister court in Houston held that the trial court did not abuse its discretion in failing to hold a hearing on the motion, reasoning that when a movant does not request a hearing, the trial court is not required to convene a hearing *sua sponte* on a motion for a new trial. *Id*. (citing *Gallegos v. State*, 76 S.W.3d 224, 228 (Tex. App.—Dallas 2002, pet. ref'd); *Brooks v. State*, 894 S.W.2d 843, 847 (Tex. App.—Tyler 1995, no pet.)).

We are faced with a practically identical situation here. A trial court ordinarily abuses its discretion when it fails to hold a hearing on a motion for a new trial when the defendant makes a request for a hearing on the motion. *Martinez v. State*, 74 S.W.3d 19, 21–22 (Tex. Crim. App.

61

2002). Yet Pena's motion for a new trial, alleging various grounds for granting the motion, requested that the trial court grant him a new trial, but made no request for the trial court to conduct a hearing on the motion. The record does not indicate that Pena made such a request elsewhere. As such, we conclude that the trial court did not abuse its discretion when it declined to hold a hearing on Pena's motion for a new trial because the trial court was not required *sua sponte* to do so.[3] *See Ramos*, 2003 WL 164456, at *1; *Gallegos*, 76 S.W.3d at 228; *Brooks*, 894 S.W.2d at 847. Issue Four is overruled.

## Motion for Mistrial

In Issues Fourteen and Fifteen, Pena argues that the trial court abused its discretion by failing to grant a mistrial following two sustained objections. First, in Issue Fourteen, the State asked Pena on cross-examination whether his parental rights of three of his other children had been terminated. The trial court sustained Pena's objection that the prejudicial value outweighed the probative value of the question and instructed the jury to disregard the question. Second, in Issue Fifteen, the State asked Ruth Pena, Pena's wife, whether Pena had previously been convicted of assault-family violence against her. Pena's counsel objected to the question as being improper and factually incorrect given that Pena had received deferred adjudication. The court sustained the objection and instructed the jury to disregard a portion of the question.

## Standard of Review

---

[3] As our sister courts deciding these cases did not address the substantive issues contained within the motions for a new trial at issue in those cases, we also decline to address the issues contained within Pena's motion for a new trial on the merits. *See Ramos*, 2003 WL 164456, at *1; *Gallegos*, 76 S.W.3d at 228; *Brooks*, 894 S.W.2d at 847. Likewise, because the issues contained within Pena's motion for a new trial are not raised as separate issues in his brief, we decline to consider them on the merits for this reason as well. *See* TEX. R. APP. P. 38.1(f); *Garrett v. State*, 220 S.W.3d 926, 928 (Tex. Crim. App. 2007) ("Rule 38.1 requires that an appellant designate all issues for review in the original brief.").

62

When, as here, a trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, we consider whether the trial court abused its discretion in denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). We will not disturb the trial court's ruling on the motion for mistrial if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.* (quoting *Hawkins*, 135 S.W.3d at 77). As such, a mistrial is appropriate when the improper conduct in question is so harmful that the case must be redone. *Hawkins*, 135 S.W.3d at 77. In most instances, the trial court's instruction to disregard the improper statement will cure the alleged harm. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001).

In considering whether the trial court abused its discretion by failing to grant a mistrial, we consider three factors: (1) the severity of the conduct or prejudicial effect; (2) curative measures; and (3) the certainty of the conviction absent the misconduct. *Hawkins*, 135 S.W.3d at 77 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

### Termination of Parental Rights

During the guilt-innocence phase of trial, the defense called Pena to testify. Pena testified that he had six children, including J.M. and J.P., and that he had gained custody over J.M. and J.P. when their biological mother had asked him to take them from her custody. Pena stated that J.M. was in poor physical health when he picked her up, and he took measures to restore her health, such as buying medication for her and taking her to doctors. As Pena testified, he began sobbing because he felt guilty at the time for leaving them. On cross-examination, Pena testified that he

63

had three other children in addition to J.M. and J.P. but he did not have full custody of the other three.

When the State asked Pena whether his parental rights to the children other than J.M. and J.P. had been terminated, defense counsel objected and asked to approach the bench. During the ensuing bench conference, defense counsel argued that the testimony was irrelevant and that its probative value was significantly outweighed by the risk of unfair prejudice. The State responded that Pena attempted to portray himself as a good father who had a good relationship with his children, and yet had testified that he did not have custody of three of his children. The trial court agreed with defense counsel and sustained his Rule 403 objection, and upon his request instructed the jury to disregard the State's question. The trial court denied the defense's subsequent request for a mistrial.

On appeal, Pena contends the trial court abused its discretion in failing to grant the defense's request for a mistrial because the State's question inflamed the passions of the jury, and because the inculpatory evidence against Pena was "marginal at best." The State counters that the prosecutor properly asked the question to rebut Pena's direct testimony that he had a positive relationship with his children.

We find that the trial court did not abuse its discretion by denying Pena's motion for mistrial. On review, we note that the trial court immediately instructed the jury to disregard the State's question and the issue was not raised again at trial. Further, there is no evidence in the record suggesting that the question impacted the jury or its verdict. While Pena received the maximum available punishment for the indecency with a child charge (twenty years' incarceration), he received twenty years' incarceration for his conviction for aggravated sexual

64

assault of a child, or well below the statutory maximum punishment for that offense. *See* TEX. PENAL CODE ANN. §§ 12.32, 12.33, 21.11(d), 22.021(a)(2)(B) (maximum punishment for indecency with a child by contact, a second-degree felony, is twenty years' incarceration, while the maximum punishment for aggravated sexual assault of a child, a first-degree felony, is life imprisonment); *see also Durant v. State*, No. 08-11-00168-CR, 2013 WL 2922267, at *4 (Tex. App.—El Paso June 12, 2013, no pet.) (not designated for publication) (a jury's punishment assessment below the statutory maximum for a particular offense suggested that a prosecutor's improper question did not impact the jury or its verdict).

Thus, while the potential for unfair prejudice existed as a result of the prosecutor's question, the trial court took immediate curative actions by instructing the jury to disregard, and there is no evidence that the State's question impacted the jury's verdict. Pena has not demonstrated that the State's conduct was so harmful that the case must be redone, and we conclude the trial court did not abuse its discretion in denying Pena's request for a mistrial such that its decision was outside the zone of reasonable disagreement. *See Hawkins*, 135 S.W.3d at 77; *see also Durant*, 2013 WL 2922267, at *4 (trial court did not abuse its discretion in denying defendant's motion for mistrial where no residual prejudice existed after defendant's objections and the trial court's curative instruction to disregard, and where the defendant's punishment for the charged offense was well under the statutory maximum punishment for the offense). Issue Fourteen is overruled.

### Conviction of Family Violence

Finally, we consider Issue Fifteen, in which Pena argues that the trial court abused its discretion in failing to grant a mistrial after the State asked Pena's wife, Ruth Pena, whether Pena

had been convicted of family violence committed against her. During the guilt-innocence phase of trial, Pena called Ms. Pena to testify. Ms. Pena stated that she and Pena were unable to live together without conflict because of the problems they were having with Pena's children, especially J.M. On cross-examination, the prosecutor asked Ms. Pena if she had separated from Pena because of the problems J.M. caused, which Ms. Pena again confirmed. The State then asked whether Ms. Pena had remembered making a police report, and defense counsel objected and asked to approach the bench.

During the ensuing bench conference, the prosecutor announced her intent to elicit testimony that Pena had previously pled guilty to a charge of assault-family violence against Ms. Pena, and that he was placed on deferred adjudication for committing that offense. The prosecutor further stated that Pena's conviction was at issue because the defense had left the impression that Ms. Pena had separated from Pena because of issues with J.M. Over Pena's relevance objection, the trial court stated that the defense had opened the door to testimony regarding the incident by leaving a false impression with the jury, and it allowed the prosecutor to ask whether Ms. Pena had made a report of family violence against Pena but not to "get into all the great details." When cross-examination resumed, the prosecutor asked Ms. Pena whether she had made a report of family violence against Pena, she responded that she had called 911. When the prosecutor asked Ms. Pena whether Pena had been "convicted" of family violence against her, defense counsel objected to the question being incorrect, and the trial court sustained the objection. Defense counsel asked for an instruction to disregard the prosecutor's question, which the trial court gave, but the trial court denied the defense's motion for a mistrial immediately following the trial court's instruction to disregard.

66

On appeal, Pena argues that the trial court abused its discretion by failing to grant his motion for mistrial, advancing essentially the same arguments mentioned in the preceding issue. The prosecutor's question regarding whether Pena had been convicted of family violence was prejudicial and inappropriate, as the trial court had directed the prosecutor to only ask whether Ms. Pena had made a report of family violence against Pena. Yet, the trial court sustained the objection and took immediate curative measures by instructing the jury to disregard the question. Again, there is no evidence suggesting that the question affected the jury or its verdict because the assigned punishment for the aggravated sexual assault of a child charge was well beneath the statutory maximum punishment. *See Durant*, 2013 WL 2922267, at *4 (finding "by the narrowest of margins" that a prosecutor's questions regarding a defendant's charge that had been dismissed were inappropriate, but "fell short of qualifying as severe").

Again, Pena has not demonstrated that the State's conduct was so harmful that the case must be redone, and we conclude that the trial court's decision to deny the motion for mistrial was within the zone of reasonable disagreement and no abuse of discretion occurred. *See Hawkins*, 135 S.W.3d at 77; *see also Durant*, 2013 WL 2922267, at *4 (trial court did not abuse its discretion in denying defendant's motion for mistrial after State improperly asked defendant about his dismissed criminal charges because no residual prejudice existed after defendant's objections and the trial court's curative instruction to disregard, and because the defendant's punishment for the charged offense was well under the statutory maximum punishment for the offense). Issue Fifteen is overruled.

## CONCLUSION

Having overruled Issues One through Nineteen, we affirm the judgment of the trial court.

67

GINA M. PALAFOX, Justice

March 27, 2019

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)